# CONSOLIDATED GAS ELECTRIC LIGHT AND POWER COMPANY AND BALTIMORE ELECTRIC COMPANY *vs.* JOHN N. CHAMBERS.

*Lineman on Pole Injured by Breaking of Cross-Arm—Duty to Inspect Poles—Assumption of Risk—Insufficient Evidence of Negligence.*

When an employing corporation, owning poles carrying wires, has no independent system of inspection of the poles, cross-arms, steps, etc., and a lineman employed to work on such poles has no reason to believe that such inspection is made, he has no right to rely on the employer for inspection, but must himself make such tests as may be necessary to ascertain whether it is safe to go upon them, and cannot hold his employer responsible for injuries received by him by the giving away of such poles, or cross-arms, unless there was some defect in them when they were originally placed in position, or the employer had some knowledge of the defect which was not communicaetd to the lineman; provided the lineman is not such an inexperienced person as is entitled to be instructed as to the danger.

On a pole owned by a telephone company were strung the wires of an electric company and of a power company, the two latter companies being the defendants in this case. A cross-arm carrying wires of the power company was the lowest on the pole, and while the plaintiff was engaged in affixing above it a cross-arm for the electric company, he stood on that lowest cross-arm, which broke on account of dry rot on the inside and plaintiff fell to the ground and was injured. No evidence of any defect in the original construction of this cross-arm or in the wood of which it was made was offered. Plaintiff was an experienced lineman, and knew that it was not customary for the defendant to inspect the poles on which he was sent to work. He also knew that cross-arms some-

times break and he did not make use of the safety belt which he had with him. In an action against both companies to recover damages for the injury so occasioned, *held,* that the plaintiff's employer is not liable, since the plaintiff should have tested the cross-arm before putting his weight on it, and the injury was caused by a defect which he himself could have detected as well as the defendant, and which the defendant was not required to guard against by an independent inspection, and the risk was one which the plaintiff assumed as necessarily incident to the employment.

*Held,* further, that the plaintiff is not entitled to recover against the power company, the owner of the cross-arm, since it was equally his duty to rely on his own inspection as against that company, and there is no evidence to show that it was aware of the defective condition of the cross-arm.

*Decided January 11th, 1910.*

Appeal from the Superior Court of Baltimore City (STOCK-BRIDGE, J.), where there was a judgment on verdict for the plaintiff for $2,000.

The plaintiff offered the following prayers which were modified by the Court by the insertion of the words italicized and the omission of the words in brackets:

*Plaintiff's 1st Prayer.*—If the jury find from the evidence that on May 21, 1907, the plaintiff was employed by the defendant, the Baltimore Electric Company, as a lineman. And that on said date the plaintiff as such lineman, with the witness Ford also a lineman in the employment of said defendant, was ordered by said defendant to ascend a certain pole and construct on said pole certain cross-arms for the use of the said defendant, if they so find.

And further find that in the doing of said work on said pole that the only mode or method of doing the same by the plaintiff, required him to stand on a cross-arm on said pole of the Consolidated Gas and Electric Light and Power Company, as testified in this case, if they so find.

And further find; that the said cross-arm of the Consolidated Gas and Electric Light and Power Company on which the plaintiff was required to stand in doing said work, if they so find, was rotten beneath the surface, and which rottenness was hidden from outside view, if they so find.

And further find, that the moment the plaintiff, while using due and ordinary care, if they so find, stepped on said cross-arm to do said work, the said cross-arm, because of said rottenness, immediately broke and threw the plaintiff to the ground below and injured him, then the verdict of the jury should be for the plaintiff as to said defendant, the Baltimore Electric Company.

Provided the jury further find that the rottenness of said cross-arm, which caused it to break and throw the plaintiff to the ground below and injured him, if they so find, was un known, hidden and not obvious to the plaintiff, when he stepped on said cross-arm to do said work, if they so find. And further find that under the plaintiff's employment by said defendant, he was not required to inspect said cross-arm to discover in it rottenness unknown, hidden and not obvious to him, if they so find *and that said rottenness was not discoverable by the plaintiff by the exercise of ordinary care.* And further find from all the facts and circumstances in evidence, that the plaintiff in stepping on said cross-arm used due and ordinary care and was not guilty of negligence directly contributing to his said injury, if they so find, and provided further, that the said defendant, by the exercise of ordinary care could have (by the proper inspection of said cross-arm) discovered the inside rottenness of said cross-arm before sending the plaintiff up said pole to do the work for said defendant of constructing said buck-cross-arms, if they so find, and also find from all the facts and circumstances in evidence that the said defendant was guilty of a want of ordinary care (in failing to inspect said cross-arms for inside rottenness before requiring the plaintiff to do said work on said pole, which required him to stand on said cross-arm, if they so find) and that said want of ordinary care on the part

of the said defendant directly contributed to said injury to plaintiff. (*Granted as modified.*)

*Plaintiff's 3rd Prayer.*—If the jury find from the evidence that on May 21, 1907, the defendant, the Consolidated Gas and Electric Light and Power Company, was the owner and had control of a certain cross-arm on a certain pole, which pole was in the common use of the Maryland Telephone Company and the defendants to this suit, and that the use of said pole was a part of the permanent plant of the said defendant, the Consolidated Gas and Electric Light and Power Company, and that said cross-arm on said pole on May 21, 1907, was rotten on the inside and dangerous to stand upon by any lineman, if they so find.

And further find, that it was necessary for the plaintiff in doing the work assigned him by his employer, the Baltimore Electric Company to stand on said cross-arm, if they so find; and that on said date as the plaintiff stepped on said cross-arm, the same broke and threw him to the ground and injured him, then the verdict of the jury should be for the plaintiff, as against the defendant, the Consolidated Gas Electric Light and Power Company; provided, that the rottenness of said cross-arm was unknown, hidden and not obvious from the outside to the plaintiff; *and that said rottenness was not discoverable by the plaintiff by the exercise of ordinary. care,* and provided further that the plaintiff exercised under all the facts in evidence ordinary care in stepping on said cross-arm. And provided further the jury find that the defendant, the Consolidated Gas Electric Light and Power Company, by the exercise of ordinary care, could by inspection have discovered said inside rottenness of said cross-arms before the plaintiff stepped on said cross-arm and removed it. (*Granted as modified.*)

The defendant's first and second prayers withdrew the case from the jury for lack of evidence of negligence and were refused.

*Defendant's 3rd Prayer.*—The defendant, the Consolidated Gas Electric Light and Power Company of Baltimore, prays

the Court to instruct the jury that if they find from the evidence that the cross-arm which broke and caused the plaintiff's injuries, was at the time the plaintiff went upon the same in such bad condition that it must have been evident and apparent to the plaintiff had he used due care that said arm was dangerous and insufficiently strong to support his weight, then their verdict must be in favor of this defendant. (*Granted.*)

*Defendant's 4th Prayer.*—The defendant, the Consolidated Gas Electric Light and Power Company of Baltimore, prays the Court to instruct the jury that if they find from the evidence that the plaintiff by his own negligence directly contributed to the happening of the accident on account of which this suit is brought, that then their verdict must be in favor of this defendant, even though they may find that this defendant was also negligent and no matter how great the negligence of this defendant may have been. (*Granted.*)

*Defendant's 5th Prayer.*—The defendant, the Consolidated Gas Electric Light and Power Company of Baltimore, prays the Court to instruct the jury that if they find from the evidence that it was not necessary for the plaintiff in doing the work on which he was engaged at the time of the accident to stand upon this defendant's cross-arm, *and that the plaintiff failed to exercise ordinary care in going upon said cross-arm in the manner and under the circumstances testified to in the evidence,* that then their verdict must be in favor of this defendant. (*Granted as modified; the words in italics being added by the Court.*)

*Defendant's 6th Prayer.*—If the jury find from the evidence that it is the usual practice of ordinarily careful and prudent linemen to examine or test cross-arms on poles before standing on same, either by sounding the same with plyers or hammer, or with the foot or otherwise and to ascertain from the sound so made whether or not the cross-arm is in safe condition to support the weight of a man, and if they find that reasonable care requires a lineman so to do, and if the jury find that the plaintiff in this case failed to

use such reasonably necessary precautions, then their verdict must be for this defendant.   (*Granted.*)

The cause was argued before BOYD, C. J., BRISCOE. PEARCE, BURKE and THOMAS, JJ.

*Vernon Cook* (with whom were *Gans & Haman* on the brief), for the Consol. Gas, etc., Co., appellant.

*William L. Marbury* and *Walter L. Clark,* for the Baltimore Electric Co., appellant.

*Thomas G. Hayes* and *R. E. Lee,* for the appellee.

BOYD, C. J., delivered the opinion of the Court.

This suit was instituted by the appellee against the Consolidated Gas Electric Light and Power Company, Baltimore Electric Company of Baltimore City and the Maryland Telephone Company.   At the end of the plaintiff's case, a verdict was rendered in favor of the Telephone Company, and the case proceeded against the other two companies, resulting in a verdict in favor of the plaintiff against them.   We will speak of the first named as the Consolidated · Company, of the second as the Electric Company, and of the other as the Telephone Company.

There was a pole about sixty feet high, on the corner of Forest avenue and Ware alley, in Baltimore City, which was owned by the Telephone Company, and which was used by the three companies—although the record does not accurately show what arrangement there was between them.   There were five cross-arms of the Telephone Company at the top. then three of the Electric Company, and one of the Consolidated Company.   The latter was about thirty-five feet from the ground.   On May 21st, 1907, the plaintiff and Frank B. Ford, who were linemen of the Electric Company, were ordered to put three cross-arms on this pole, which we understand to be the three mentioned above.   The plaintiff said

that his duties as lineman were to climb poles, put on cross-arms, string wires and hang transformers, and Ford spoke also of putting up poles. They had put two of the cross-arms on, and were about to put the third on when the plaintiff, to quote his testimony, "started to get in position to do the work and stepped on this cross-arm which broke and he fell to the ground." The cross-arm which broke belonged to the Consolidated Company and was the lowest one on the pole. The plaintiff testified that before he stepped on it, he looked at it and it appeared to be sound; that he could not have done the work without standing on the arm, because it was in the way; that he could not have stood on one of the steps (which consisted of iron spikes placed in the pole about eighteen inches apart), because they did not come up that far, and were not close enough to stand on.

Ford testified that he told plaintiff to get around the pole, so he (Ford) could set the bolts and put the nuts on, and as plaintiff got down from the position he was in he put his foot on the arm about eighteen inches from the pole, and over the top of the brace, and "almost before I knew anything, Mr. Chambers left me and I was on the pole by myself." He also said that was the proper place for the plaintiff to go to get the arm the way he wanted it, to adjust it so as to get the bolts in, and that there was no other position the plaintiff could have taken to do that work. The testimony tends to show that the cross-arms are ten feet long, and three and a quarter by four and a half inches thick, and that the one that broke had the "dry rot" on the inside. The plaintiff was very badly injured by the fall.

The two companies offered separate prayers. The Electric Company has abandoned its exceptions, excepting those to the rejection of its first, second, third and fourth prayers, and to overruling its special exception to the plaintiff's first prayer, which was granted. Those prayers of that company were intended to take the case from the jury, and we will first consider them. It will be borne in mind that the plaintiff was an employee of the Electric Company, and he went

upon the pole to do certain work for that company. The question presented by those prayers is whether the plaintiff is entitled to recover from his employer, the Electric Company, for injuries sustained by reason of the cross-arm of the Consolidated Company being defective and breaking under his weight. The ground relied on in the declaration for a recovery against the defendants is: "That the rottenness of said cross-arm was unknown and not obvious to the plaintiff, because the paint on said cross-arm concealed from the plain-tiff the said rottenness. That it was the duty of said de-fendants to said plaintiff, when performing his duties as lineman on said pole, by the exercise of ordinary care to have discovered the rottenness of said cross-arm and removed the same or warned the said plaintiff of the rottenness of said cross-arm. This the defendants negligently and carelessly failed to do," etc.

One peculiarity about the case is the fact that the plain-tiff, as the lineman of the Electric Company, was injured by a cross-arm which belonged to the Consolidated Company, over which the Electric Company had no control. The al-leged violation of duty by the two companies is therefore based on two separate grounds—the one sending its employee into a dangerous place without warning him, or previously examining it, and the other maintaining a dangerous place. There is nothing to show that the Electric Company had the right to remove the defective cross-arm, and therefore its re-sponsibility, if any, must rest on the failure to discover the defect and warn the plaintiff of it. It is not contended that it did make an examination or test of the cross-arm, or did warn the plaintiff that it was defective. The precise ques-tion, therefore, that presents itself *in limine* is, whether it was the duty of that company to have inspected the cross-arm of the other company, before sending the plaintiff upon the pole.

The general use of electricity for various purposes has brought before the Courts many cases involving the duty, *vel non,* of inspecting poles and their appurtenances. The

plaintiff testified that he did not know of any system of inspecting the poles this defendant had, and there is no proof that it had any beyond what the linemen themselves did. He was not therefore misled by any knowledge of inspection by the company. He had been engaged in the work of lineman for fourteen years, had been employed by ten other companies, doing regular lineman's work, such as climbing poles, stringing wires, working on cross-arms, etc. He had worked for this company for four months before he was injured, and had previously worked for it, probably a year or so altogether, but had not worked for the Consolidated Company. He was an experienced lineman, and of course, knew, as he testified, that cross-arms sometimes broke, that they sometimes became rotten from one cause or another, and that there was a certain amount of danger in going on one. He had a safety belt with him and was told by his companion to put it on. It is not easy to see, therefore, why under such circumstances his employer should be held responsible for what he manifestly had as good an opportunity to detect as any other employee of his employer would have had. Of course, if a company had, to the knowledge of its linemen, a regular system of inspection of the poles and cross-arms, independent of what the linemen themselves would be supposed to make, another question would arise, for then the linemen would have the right to assume that the independent inspection had been made.

It is therefore not surprising to find that, in the absence of such independent inspection, the general weight of authority is that "an experienced lineman assumes the risk of the breaking of any pole he is called upon to climb in the course of his employment, if the defect which caused the pole to break was not of original construction, and that therefore his employer owes him no duty to inspect the pole before sending him upon it." Note to *Lynch* v. *Saginaw Valley Traction Co.,* 153 Mich. 174, reported in 21 L. R. A. N. S. 774, where a great many cases are cited. There is no evidence tending to show that there was an original defect in this cross-arm.

It is true that the plaintiff testified that he had never been specially instructed as to detecting faults in cross-arms, so as to see whether they were rotten or not, but it would not require more special knowledge than a lineman of ordinary intelligence, of fourteen years' experience, would be presumed to have, to make such a test as would be necessary to make himself reasonably safe. As was said in *McIsaac* v. *Northampton Lighting Co.,* 172 Mass. 89, in speaking of linemen: "They easily could make any necessary tests to ascertain the condition of the poles as to soundness without the aid of special inspectors, and, from their knowledge of common affairs, could judge whether the pole was safe to go upon." And again in that case, it was said, the plaintiff "must have known that it would be inexpedient and impracticable to have a man or company of men to go and examine each pole upon which a lineman was about to work, to see whether it would sustain the strain which the work would put upon it."

In *Sias* v. *Con. Lighting Co.,* 73 Vt. 35, it was said, in speaking of a lineman's examination of a pole before going on it: "It is auxiliary to the lineman's principal work, can be conveniently made in connection with it, and requires no separate training. It is difficult to conceive of any preliminary work that would be more clearly in the line of the servant's duty. It could hardly be required that a company sending out a gang of men to repair its line should send other men before them to inspect the poles, and determine which could safely be climbed without the taking of precautions." In *McGorty* v. *S. N. E. Tel. Co.,* 69 Conn. 635, referred to in *Stewart & Co.* v. *Harman,* 108 Md. 451, it was said: "It cannot be laid down as a proposition of law, as seems to be claimed by plaintiff's counsel, that the linemen of telegraph and telephone companies have a right to rely upon the soundness and safety of the poles upon which they are working, and that it is the duty of such companies to inspect and test poles, and support such as are insecure, before permitting their linemen to climb them. Whether it is incumbent upon the master or the servant to perform such a duty is usually a

question of fact depending upon the terms of the contract of employment, the servant's knowledge of the hazaids of the work in which he is engaged, his ability and opportunity to discover the dangers to which he is exposed and to avoid them, and upon other circumstances."

The same rule is applicable to the cross-arms upon electric poles. In *Flood* v. *U. N. Tel. Co.,* 131 N. Y. 603, a lineman was killed by the breaking of a cross-arm on which he sat while working on one of the defendant's poles. It was there said: "The defendant had a system of inspection which appears to have been all that was practicable. Its inspectors went along the line of the telegraph poles and wires, and carefully looked at them, and tried the poles to see if they were still strong and adequate. They were provided with arms so that if they discovered any that were insufficient they could replace them. They were not expected to climb up every pole and examine the arms thereon. Such an inspection would be manifestly impracticable and unnecessary The linemen all discharged their duties in the daytime. They have frequent occasions to climb the poles and work about the arms, and obviously they are the persons who are expected to see the condition of the arms, and if they find them insufficient, to replace them or report them. It is the obvious duty of every lineman before going upon one of these arms many feet above the earth to inspect it for his own safety." See also *Johnston* v. *Syracuse Lighting Co.,* 193 N. Y. 592; *Britton* v. *Central Union Tel. Co.,* 131 Federal, 844; *Roberts* v. *M. & K. Tel. Co.,* 166 Mo. 371; *South, Bell Tel. & Tel. Co.* v. *Starnes,* 122 Ga. 602, although the latter was in part governed by a statute.

Many other cases might be cited, but those above are sufficient to show the trend of the decisions, and others can be found referred to in the note and cases we have mentioned. While the facts necessarily differ in them, the general rule to be deduced from them may be thus stated: when the employer has no independent system of inspection of poles, cross-arms, steps, etc., and the lineman has no reason to believe

that such inspection is made, he had no right to rely on the employer for such inspection, but must make such tests himself as may be necessary to ascertain whether it is safe to go upon them, and cannot hold the employer responsible for injuries received by him by such poles, cross-arms, or steps giving away, unless there was some defect in them when they were originally placed in position, or the employer had some knowledge of the defect, which was not communicated to the lineman—provided, of course, the lineman is not such an inexperienced person as is entitled to be instructed as to the danger. Of course, there may be some exceptions to such a general rule, but we find nothing in this record that would take the case out of it. There is more reason to apply such a rule to cross-arms than to poles, for there are usually so many more of them, and, as said in *Flood's Case, supra,* inspectors "were not expected to climb up every pole and examine the arms thereon. Such an inspection would be manifestly impracticable and unnecessary." Indeed it is far safer for the linemen themselves to make the inspection and such tests as may be necessary for their safety, as they would do so at the very time they went upon them, while in many instances that would be impossible if separate inspectors were relied on.

This doctrine is not in conflict with the one we have so often announced, that the master must furnish a reasonably safe place for his servant to work in, as that is always subject to the qualification that when a servant knowingly engages in dangerous work he must not rely alone on such rule, but he assumes the risk incident to such dangerous place. The plaintiff was told by his companion "to get his safety and to get around here (indicating) so I could set them both," and he gave as a reason for not using the safety that he did not have time—meaning that he fell before he put it on. But if he had taken time to use the precautions which were at hand he would have escaped this unfortunate accident. In *Stewart & Co.* v. *Harman,* 108 Md. 446, we quoted from *Buswell on Per. Inj.,* sec. 204, that: "The principle is that where a

. servant has as good opportunity as the master to ascertion and avoid the danger himself, he will have no recourse against the master in case he is injured thereby, and he accepts the employment upon this implied condition." Then after quoting from *McGorty* v. *S. N. E. Tel. Co., supra,* JUDGE WORTHINGTON said: "And it was determined under the circumstances of that case 'that each lineman should look out for his own safety in climbing poles,' and that the master was not guilty of negligence, for failure to provide a system of independent inspection."

The appellee quotes in his brief an expression used by this Court in *Md. Tel. Co.* v. *Cloman,* 97 Md. 620, that: "It was . the duty of the plaintiff if he relied on failure to inspect, to have offered some testimony which would have justified the jury in finding that the defect causing the injury was one which could have been discovered by the usual and ordinary methods of inspection, commonly adopted by those in the same kind of business, which was conducted by the defendant," and he claims there was such testimony. That statement was quoted from *Schaefer's Case,* 96 Md. 88, but while the expression was applicable in both of those cases, it is not here. In the *Cloman Case* the defect relied on was a knot in a cross-arm, which, of course, was there before the cross-arm was put in position, and the question was whether the company's agents could have discovered it by such inspection as is usual in such cases, but, there is no evidence that there was any defect in the original construction of this cross-arm, or in the wood of which it was made. If there had been, the further question would have arisen as to how far the Electric Company could be held responsible for it, inasmuch as the Consolidated Company, and not the Electric Company, was the owner of the cross-arm. In *Schaefer's Case* there was machinery which not only required care in the original purchase, but it is the duty of an employer to have such inspection of machinery of that character, after it is put in use, as is commonly adopted by those engaged in the same kind of business. In many instances the employee who runs a ma-

chine would be utterly incapable of detecting defects, which may prove dangerous and disastrous, but surely no man is a competent lineman, who, after fourteen years' of experience, cannot tell by such tests as independent inspectors would adopt, as well as they could, whether a cross-arm is safe to place his weight upon it in addition to the weight of the wires it is intended to carry. A careful man, or even a careful boy, will generally make some test of a limb of a tree, before he places his whole weight upon it, if it be of such size or appearance as to suggest it may give way.

Nor are such cases as *Crawford* v. *United Ry. Co.,* 101 Md. 402, and *Md. D. & V. R. Co.* v. *Brown,* 109 Md. 304, applicable to this. It was said in *Crawford's Case* that "when the business of the master is such that the safety of one servant depends upon the way in which other servants do their work, it is the duty of the master to *adopt, promulgate* and *enforce* reasonable and sufficient rules to protect and promote the safety of its employees exposed to danger." There can be no doubt about that, and when it is the duty of the master to inspect, he should have a system of rules providing for proper inspection, which should be rigidly enforced. Crawford was a conductor, and it was not his duty to inspect the car before he took charge of it, to see whether the handhold which caused his injury was in proper condition. So in *Brown's Case,* he was injured by a collision between his train and a runaway engine. It was not his business to inspect the engine which came in collision with the one he was driving. In cases of that character the servant has the right to expect *and require* the master to make such inspections as are customary and proper, but in this case, where the plaintiff had no reason to suppose that independent inspectors were employed to inspect or test the cross-arms, where there is no evidence that the company had ever undertaken to have such inspection, and where there is no necessity shown for it, as the plaintiff could have tested it as well, and perhaps better, than if it had been done at stated intervals by others, there was no such duty resting upon the company.

So without further discussing the cases, or inquiring how far the fact that the cross-arm belonged to another company would relieve the Electric Company, if otherwise responsible, we are of the opinion that the plaintiff cannot recover against it.

It only remains to briefly consider his right to recover against the Consolidated Company. Assuming that there is no doubt about the right of the plaintiff, as the servant of the Electric Company, to go on this pole, and that if that company could have been held responsible, the Consolidated Company could likewise have been so held, as the owner of the cross-arm, and hence owing a duty to the servants of the other companies having the use of the pole to exercise care, what is the standard of that care? It is said in the note to C. C. C. & St. L. Ry. Co. v. Berry, reported in 46 L. R. A., on page 52, that: "The standard of that care is virtually identical with the standard exacted from a master to his own servant," and that must be a correct statement of the rule. There is no contractual liability to the servant of another person, although there may be in some instances a duty which the owner owes him, if he authorized him to go upon his property, but as we have determined that the Electric Company is not responsible, under the circumstances, it would seem to be clear that the Consolidated Company cannot be held liable merely because it was the owner of the cross-arm. Much of what we have said above is applicable to this branch of the case. If it was the duty of the plaintiff, as we have said it was, to rely on his own inspection and tests, as between him and his employer, it was equally so, as between him and the Consolidated Company, which owned the cross-arm. There is no evidence to show that it was aware of its defective condition, and if it could not be detected by the plaintiff, if he made a proper examination, there is nothing to show it could have been by the Consolidated Company's agents, and if it could have been detected by the plaintiff by the use of ordinary care, then, of course, he could not hold this defendant responsible.

So, although we deeply sympathize with the plaintiff for this unfortunate accident, we feel constrained under the law to reverse the judgment, and, as there can be no recovery, a new trial will not be awarded.

> *Judgment reversed, without awarding a new trial, the appellee to pay the costs.*